# In the United States District Court
# for the
# Western District of Texas

| | |
|---|---|
| Structural Metals, Inc. § | |
| v. § | |
| § | SA-09-CV-984-XR |
| S&C Electric Co. § | |
| § | |

## ORDER

On this day came on to be considered Defendant's motion for leave to amend answer (dkt. no. 49); Defendant's motion for summary judgment (dkt. no. 50) and Plaintiff's motion to limit expert testimony (dkt. no. 51).

## Background

SMI operates a recycling plant in Seguin, Texas that processes and recycles scrap metals with the use of an industrial metal shredder. Because of its size and the nature of its operations, the Seguin Mill demands a considerable amount of electric power to operate. Sometime during 2003, SMI contacted S&C in an effort to supply a more stable and regulated energy supply throughout its operations. SMI contacted S&C about purchasing a PureWave AVC[1] Adaptive VAR Compensator for use at the Seguin Mill.

After various discussions, on or about May 4, 2005, S&C sent a proposal

---

[1] Adaptive VAR Compensator ("AVC") devices are designed to help reduce voltage sags or dips (sometimes referred to as "flicker") and improve something called "power factor."

(A4–317 Rev. I) to SMI. To "correct the power quality problem", S&C stated that "a system solution that offers a minimum of 12 MVAr of reactive power is required." In paragraph 1.1, S&C proposed a "system solution consisting of two 6 MVAR, 15 step, 600 V, PureWave AVC systems. The AVC system will be connected via two 5 MVA step-up transformers, that will be connected to the 13.8 kV Bus through a 13.8 kV Circuit Breaker." The AVC system was proposed to be enclosed in a 15 x 30 foot building, and cooled by 3 x 7.5 tons A/C systems supplied by S&C. As an alternative pricing proposal, S&C could "also elect to purchase the building, transformer and breaker directly [i.e. another company could supply these items]." S&C proposed to provide "engineering and manufacturing services." "Start-up and commissioning services" were also proposed "to confirm operation of the equipment and overall system performance...." It is undisputed that Plaintiff paid S&C $306,500. In addition, Plaintiff alleges that it incurred various additional costs to prepare the site for the installation of the AVC system.

Construction of the project began in December 2005. SMI did not purchase the transformers, building, cooling system, or CTs from S&C. SMI purchased those items from other suppliers. SMI did not hire S&C to do the electrical installation of the AVC. SMI hired an electrical contractor, CCC Group, to install the AVC units and connect those units to their respective power supply transformers. The system went "on-line" on or about February 10, 2006. Plaintiff alleges that the AVC system never functioned as promised. It alleges that the system began to overheat causing the ambient temperature in the

2

building to reach and exceed 115 degrees, despite the three 7.5 ton air conditioning units located in the building. In May 2006 there was a malfunction involving the primary AVC unit. On November 6, 2006, S&C sent a letter to SMI apologizing for the overheating problems and extended its warranty on the system. Plaintiff alleges that on November 17, 2006, there was a capacitor failure. On December 2, 2006, a fire developed that destroyed the "secondary unit," the building and the air conditioning units.

The cause of the fire is contested by the parties. Defendant argues that the fire did not originate from the AVC units. It argues that the fire originated in the "raceway" between the secondary AVC unit and the south transformer.[2] Defendant argues that "secondary feeder cables" were undersized, i.e. there were not enough cables to carry the amount of current needed to energize the AVC unit. Defendant argues that it did not design the raceway, nor did it install the cables.

Plaintiff's expert counters that the origin of the fire cannot be determined. In addition, Plaintiff argues that the system never provided the minimum of 12 megabar of reactive power promised in the proposal. Accordingly, Plaintiff disputes the opinion that the cables were undersized, because Defendant has

---

[2] The AVC units and associated transformers were connected through the use of cables housed in an underground culvert. As part of the investigation into the origin and cause of the December 2, 2006 fire, SMI hired CCC Group to remove the cables that connected the secondary unit to the associated transformer. On April 5, 2007, CCC Group used a crane in an attempt to remove all the cables. Several pieces of cables were removed one-or-two at a time, but about 15 melted cables became lodged in the underground culvert and could not be removed. Witnesses of the cable removal observed cables with insulation burned off revealing melted copper.

3

failed to determine the actual amount of current flowing through the cables to establish an opinion that the cables were undersized. Alternatively, Defendant argues that Plaintiff approved the design of the cables.

Plaintiff brought this suit alleging breach of contract, breach of express warranty in the sale of goods, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.

Plaintiff seeks damages of $306,500.00 for the AVC system. In addition, it seeks $465,571.27, in incidental and consequential damages, "including damages for the construction and installation of the housing and other components of the AVC system, as well as for the cost of labor and other expenses incurred as a result of the AVC system's failure."

## Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is material if it involves a fact that might affect the outcome of a suit under governing law. *See Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994). The court must decide all reasonable doubts and inferences in the light most favorable to the non-moving party, *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir. 1994). As long as there appears to be some support

for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## Defendant's motion for summary judgment

### Breach of contract claim

Defendant argues that the sales contract between the parties required S&C to do two things: (1) supply two AVC units to SMI; and (2) commission those two units after SMI installed them. It argues that S&C did both of those things. S&C delivered the two AVC units to SMI. And, after SMI's contractor installed the two units and connected them to the respective transformers, S&C sent an employee who completed the commissioning no later than January 31, 2006. Accordingly, it argues that no breach was committed.

Plaintiff responds that Defendant agreed to provide not only the two AVC units, but also engineering, start-up and commissioning services, and that the equipment never performed as promised. Its expert, Wes Goodwin, opines that "design and installation errors by S&C contributed to overheating of the compensators...." *See also* testimony of expert William Mack Grady.

In Plaintiff's second amended complaint, with regard to the breach of contract claim, Plaintiff alleges:

> The sales agreement between S&C and SMI constitutes a contract pursuant to which Defendant agreed to provide an AVC system that would properly and adequately function in accordance with its intended design, in exchange for SMI paying Defendant the agreed upon purchase price of $306,500.00. SMI paid Defendant in full for the purchase of the AVC system. However, the AVC system never

5

worked according to its intended design, and experienced a number of failures, the last of which caused a fire that rendered the AVC system unusable. Therefore, Defendant has breached the terms of its contract with SMI.

A breach of warranty claim is distinct from a breach of contract claim. *Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991); *Materials Marketing Corp. v. Spencer*, 40 S.W.3d 172 (Tex. App.–Texarkana 2001, no pet.); *see also Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co.*, 832 F.2d 1358 (5th Cir. 1987).  An express warranty is created when a seller makes an affirmation of fact or a promise to the purchaser that relates to the sale and warrants a conformity to the affirmation as promised.  *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 746 (Tex. App.–Fort Worth 2005, no pet.). When a party fails to deliver the goods as promised, a breach of contract occurs; but when a seller delivers nonconforming goods, it is a breach of warranty. *Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W.2d 877, 890 (Tex. App.–San Antonio 1996, writ denied).   Thus, remedies for breach of warranty are generally available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner, while remedies for breach of contract are available to a buyer when the seller fails to make delivery. *Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991). Indeed, "the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell."   Tex.Bus. & Com.Code § 2.313 (Comment 4).

In this case Plaintiff is not alleging that the seller failed to make delivery.

Defendant delivered the two units and a design system. Plaintiff merely complains that the units and design system were defective. Accordingly, a breach of contract claim is inappropriate in this setting. Defendant did not breach the alleged contract. Accordingly, there is no genuine issue of material fact exist regarding the breach of contract claim and summary judgment is granted as to this claim.

**Breach of express warranty in the sale of goods**

Defendant argues that the only express warranty made was that the two 6 MVAR AVC units would correct the voltage sags and power factor problems at the Seguin plant. Defendant cites to the testimony of Henry Camarillo, then-SMI's Chief Electrical Engineer, that acceptable voltage corrections occurred. Plaintiff responds that Mr. Camarillo's testimony does not support the Defendant. Upon review of Mr. Camarillo's deposition testimony, the Court concludes that genuine issues of material fact exist regarding whether the equipment complied with the express warranty.

In the alternative, Defendant argues that any breach of the express warranty did not cause any damages. It argues that its express warranty represented that it would provide 12 MVAR of output, correct voltage sags and power factor problems. It argues that any damages incurred in this case were the result of the December 2006 fire.

Plaintiff responds that it is entitled to incidental and consequential damages as a result of the breach of express warranty.

In order to recover consequential or special damages, a plaintiff must also

7

establish that the defendant's breach of warranty proximately caused Plaintiff's injuries. See Tex. Bus. & Com. Code § 2.715(b). Proximate cause consists of both cause in fact and foreseeability. *See Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Mo. Pac. R.R. Co. v. Amer. Statesman*, 552 S.W.2d 99, 103 (Tex. 1977). Plaintiff has produced evidence that the AVC units failed to operate reliably and may have caused overheating issues. Plaintiff has also produced evidence that "design and installation errors by S&C contributed to overheating of the compensators...." Accordingly, Plaintiff has established a genuine fact issue on the cause-in-fact requirement and summary judgment on this claim is denied.

**Breach of implied warranty of merchantability**

"To prevail in a claim of breach of implied warranty of merchantability, a plaintiff must show as follows: (1) that the merchant sold goods to the plaintiff; (2) that the goods were unmerchantable, that is, unfit for ordinary purposes; (3) that the plaintiff notified the defendant of the breach; and (4) that the plaintiff suffered injury." *The Hartford v. Lyndon–DFS Warranty Services, Inc.*, No. 01–08–00398–CV, 2010 WL 2220443, *11 (Tex. App.-Houston [1st Dist.] May 28, 2010), citing Tex. Bus. & Com. Code § 2.314, cmt. 3 and various Texas case. *See also Bass v. Stryker Corp.*, --- F.3d ----, 2012 WL 266985 (5th Cir. 2012). For the same reasons as stated above, Plaintiff has established a genuine fact issue on this claim and summary judgment on this claim is denied.

**Breach of implied warranty of fitness for a particular purpose**

To prevail on a claim for breach of implied warranty for a particular purpose, the plaintiff must show that "(1) the seller had reason to know any particular purpose for which the goods were required at the time of contracting and (2) the buyer was relying on the seller's skill or judgment to select or furnish suitable goods." *The Hartford v. Lyndon–DFS Warranty Services, Inc.*, *supra*. *See also Bass v. Stryker Corp.*, --- F.3d ----, 2012 WL 266985 (5th Cir. 2012).

A plaintiff must establish that the defendant knew or should have known of a "particular purpose" for the goods or services at the time of the sale. Tex. Bus. & Com. Code § 2.315.[3] A "particular purpose" is a specific use by the buyer that is peculiar to the nature of the buyer's business. A particular purpose differs from an ordinary purpose, which is the purpose envisaged in the concept of merchantability and goes to the uses that are customarily made of the goods. *Id.* § 2.315 cmt. 2; *ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 112 (Tex. App.-El Paso 1996) (*citing Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353, 365 (Tex. App.-Corpus Christi 1994) (citations omitted)). Here, the summary judgment evidence produced by the Plaintiff establishes that S&C knew the AVC units were to be used in the Sequin facility, and a system was specifically designed for that facility. Plaintiff has established a genuine fact issue on this claim and summary judgment on this claim is denied. *See Berge Helene Ltd. v. GE Oil & Gas, Inc.*, --- F. Supp.2d ----, 2011 WL 5592846 (S.D.

---

[3] The comment to § 2.315 provides that a particular purpose "envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability." Tex. Bus. & Com. Code Ann. § 2.315 Comment 2.

9

Tex. 2011).

## Plaintiff's motion to limit expert testimony

In this motion Plaintiff seeks to exclude Forest Smith and Thomas Sing from testifying as experts. Specifically, Plaintiff argues that Mr. Smith should be precluded from testifying that the undersized cables were the cause of the fire.[4] Plaintiff argues that Mr. Smith has no information regarding how hot the cables became, what load was actually placed on the cables, whether ratings were actually exceeded, and whether the heat was dissipated. Plaintiff argues that a fact issue exists regarding whether the AVC equipment ever transmitted the expected 12 megabars of power. Mr. Smith acknowledged in his deposition testimony that the transmission of excess heat would be directly proportional to the amount of current going through the cables.

Defendant responds that it is unchallenged that an arc occurred halfway between the south transformer and the secondary AVC unit, and that the cables showed signs of ashing. Defendant argues that an electrical engineer can conclude based upon the arcing, pitting and melted copper that a fire occurred in the raceway. Defendant also argues that an electrical engineer can testify that overloaded cables can generate heat, which can eventually degrade the installation surrounding the copper. Defendant argues that Mr. Smith, referring to the National Electrical Code, calculated that for a project of this dimension 44

---

[4] Mr. Smith opined that the fire was caused by "electrical insulation failure of the south secondary feeder circuit inside the underground duct due to excessive heat created by operation of the undersized circuit." Plaintiff concedes, however, that Mr. Smith can opine that based upon his knowledge and expertise that a certain amount of cables would have been customary for a project of this size.

10

cables should have been installed, over six times the number of cables actually used in this project. Finally, Defendant argues that any criticisms Plaintiff may have regarding data Mr. Smith did not possess should go to the weight of his opinion. The Court agrees. Any "analytical gaps" go to the weight of the evidence. *See Wackman v. Rubsamen*, 602 F.3d 391, 403 (5th Cir. 2010)("This is not a case in which an expert stated a bare opinion without offering any plausible data to support that opinion. *See Guile*, 422 F.3d at 227. Dr. Natarajan explained the basis of his opinion and disclosed the disparities between the facts at hand and the studies in his source literature. In the sufficiency-of-the-evidence context, these alleged "analytical gaps" do not "take [the opinion] out of the realm of substantive evidence." *Id*. Rather, the "gaps" go to the weight of the evidence, which the jury was free to balance and Rubsamen was free to argue."). Plaintiff's motion to exclude Mr. Smith's testimony is denied.

Plaintiff seeks to limit Mr. Sing's testimony because it allegedly improperly relied upon Mr. Smith. Inasmuch as the Court has allowed Mr. Smith's testimony, this portion of the motion to exclude is also denied.

### Defendant's motion for leave to amend answer

Defendant seeks leave of court to amend its answer to include two additional affirmative defenses in light of the second deposition of Mr. Henry Camarillo. Structural Metals opposes the motion.

Four factors are relevant to showing good cause for the amendment of

pleading: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. Although Plaintiff argues that there was no new information learned at Mr. Camarillo's second deposition, Defendant argues that it became clear that a mitigation of damages issue arose. The Defendant satisfactorily explains its failure to timely seek leave to amend its answer, the amendment is important as to the issue of damages, there is little prejudice to the Plaintiff in allowing the amendment, and no continuance is needed.

Accordingly, the Court grants the motion and leave is granted to file an amended answer to include the two additional affirmative defenses. Fed. R. Civ. P. 16(b).

## Conclusion

Defendant's motion for leave to amend answer (dkt. no. 49) is GRANTED. Defendant's motion for summary judgment (dkt. no. 50) is GRANTED in part and DENIED in part. Plaintiff's motion to limit expert testimony (dkt. no. 51) is DENIED.

It is so ORDERED.

SIGNED this 19th day of March, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

Case 5:09-cv-00984-XR   Document 69   Filed 03/19/12   Page 13 of 13

13