UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| STRUCTURAL METALS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No.  SA-09-CV-984-XR |
| | § | |
| S&C ELECTRIC COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

**ORDER**

On this date, the Court considered Defendant S&C Electric Company's Motion for Summary Judgment (docket no. 92).  After careful consideration, the Court will deny the motion.

**I. Factual Background**

Plaintiff Structural Metals Inc. ("SMI") owns and operates a steel mill and a recycling plant in Seguin, Texas.  SMI contacted Defendant S&C Electric about purchasing certain equipment to solve some of the energy supply needs for its operations.  It is undisputed that, in May 2003, Henry Camarillo of SMI originally contacted S&C about buying an Adaptive VAR Compensator ("AVC"). *See* Def. Ex. 3 (email exchange between Camarillo and S&C)(expressing interest in getting a quote for a 10 mvar AVC).  Camarillo initially requested a price quote "for the equipment and the cost of commission."  *Id.*  S&C eventually conveyed a number of proposal revisions.

Revision I of the proposal, sent May 4, 2005, states it was prepared by the "Power Quality Products Division" of S&C Electric Company.  Def. Ex. 5.  The proposal is "to provide a solution for a power quality problem being experienced" by SMI's facility.  *Id.*  The proposed "system

1

solution" would offer "a minimum of 12 MVAr of reactive power" to "eliminate the power quality problem currently being experienced." *Id.*

Section 1.1 outlines the "proposed solution," which includes "a system solution consisting of two 6 MVAR, 15 step, 600V, PureWave AVC systems. The AVC system will be connected via two 5 MVA step-up transformers, that will be connected to the 13.8 kV Bus through a 13.8 kV Circuit Breaker." *Id.* The proposal states, "The AVC system will be enclosed in a 15 x 30 foot building, and cooled by 3 x 7.5 tons A/C systems supplied by S&C. A set of 3φ, 13.8 kV CTs will be used to continuously monitor the three-phase system line current serving all the various loads to be corrected by the AVC at the SMI-Texas facilities." Further, "[t]he AVC system will monitor and compensate for the required VARs on a single phase basis. Each system will be completely self-contained, installed suitable for outdoor installation, and capable of unattended operation. Each AVC will include a disconnect breaker." The proposal also stated,

> The Pure Wave AVC system package offered includes the following items:
>
> * Off loading, placement, and commissioning of 2 x 6 MVAR PureWave indoor AVC unit
> * 2 x 5 MVA Transformers to step up the voltage from 600 V to 13.8 kV (Concrete pad, off loading, and installation to be handled by SMI)
> * Installation of a 15' x 30' outdoor building with 3 x 7.5 tons A/C systems (Concrete pad provided by SMI)
> * 1 set of 3φ, 13.8 kV, 600:5 A CTs (If additional sets are required because of site load configuration we will provide at an additional cost).
>
> Should SMI chose [*sic*] to include equipment to tie into the 13.8 kV bus as part of the PureWave AVC system package, the following alternatives are included as part of this proposal.
>
> * 1 x 13.8 kV FVR outdoor substation type S&C circuit breaker
> * 3 single phase S& C Disconnect Switches.
>
> SMI may also elect to purchase the building, transformer, and breaker directly.

Def. Ex. 5. Proposal Revision I also includes a "Scope of Work" table providing a "division of responsibility for the scope of work for the installation of the AVC system." The table is divided into sections. The first section is entitled "AVC Equipment: The designated party shall design, build, install and commission the following equipment." It assigns responsibility to S&C to do engineering/specifications/design, material supply, installation, and commissioning for the AVC units (to be manufactured), two transformers (to be purchased; SMI to offload and install), a 15'x30' building including 3 x 7.5 ton A/C units (to be purchased), and 50/51 relays. It also assigned responsibility between S&C and SMI for various other components of the system: SMI would provide, install, and commission a 13.8 kV breaker and disconnect; S&C would provide load sensing and ground fault CT's, and SMI would install them.

The second section is entitled "Design & Site Services: The designated party shall design, build, install and commission the following equipment." This section assigns responsibility to SMI for such things as construction and foundation of concrete pads for AVC, transformer, and breaker; all 13.8kV cable and terminations, from the 13.8kV breaker to the transformers; ground the AVC unit; providing and routing cables, conduit, and terminations to connect 3-phases and full neutral of AVC's 600V cable to the transformers; provide and route cable and conduit for AVC control circuits and CTs (S&C to terminate); auxiliary power source 120/240V for building and AVC; provide security fence; install AVC enclosure interconnections; permits and licensing; site electrical and mechanical design engineering; location and site orientation for the AVC; site grading, surfacing, drainage, roads.

The third section is "other requirements" and assigns to S&C responsibility for training and manuals for the AVC system (including insertion transformer and switchgear), drawings (one-line,

3

layout, construction, and as built), and day-to-day project interface and coordination with customer and contractor.

> Revision I further included a section entitled "Design and Manufacturing," which provides:
>
> S&C Electric Company, will provide engineering and manufacturing services to supply the PureWave AVC system described in Section 1.1. Commissioning services, and one day of training for end-user personnel immediately following commissioning are included in the pricing.
>
> S&C's engineering and design will be in accordance with U.S. national codes and standards and recognized industry design standards. The AVC does not carry a UL sticker. UL Field certification can be provided at an additional price.

The section entitled "Commissioning" states,

> Start-up and commissioning services will be provided to confirm the operation of the equipment and overall system performance prior to turning over the AVC to the customer. The cost for S&C's engineering personnel onsite during this commissioning period has been included in the proposal. S&C has not included S&C personnel being on site during the installation, but would be pleased to provide a quotation if desired. The Start-up/Commissioning services provided will include the following:
>
> * Verify mechanical operation of breaker and switches
> * Verify electrical operation of breaker and relaying
> * Ensure PureWave AVC functionality prior to turning the system over to customer
> * Perform commissioning test

The section on "Pricing" states that "[t]he proposed system shall include the following equipment and service" and then lists various items and prices. It includes: (1) PureWave AVC Adaptive VAR Compensator, 12 MVAR, complete with di/dt reactors, capacitors, in two sets of NEMA 3R indoor enclosure "w/o off loading or installation" at $306,500; (2) Commissioning Services/Operator Training to include on-site services for equipment start-up/testing and operations training, including travel and expenses "included"; (3) Supply and install 15x30 foot air-conditioned building to house PureWave AVC on SMI supplied concrete pad at $55,353; (4) 3x7.5 ton A/C

system (included in building); (5) Set of 3 13.8 kV, 600:5 A CTs with 50/51 ground fault relay at $4,500; (6) Off-loading of AVC at jobsite at $15,000; (7) Supply 2x5 MVA Transformer (13.8 kV to 600 V) for off loading and installation by SMI at $151,851.

The "Terms and Conditions" states, "Manufactured Items (AVC): net 30 days. This shipment is quoted FOB Seguin, TX. Purchased items (Building and Transformer): 100% of the price of the transformer and/or building is due at the time, after drawing approval is completed, that S&C places an order with the supplier." The Proposal states that a purchase order should be sent to S&C Electric.

S&C asserts that SMI did not accept Revision I, but instead ordered only the two AVC units and commissioning of those two units from S&C through a purchase order dated May 16, 2006 (Def. Ex. 7). SMI agrees that it did not accept Revision I in its entirety, but denies that it failed to accept Revision I altogether. Rather, SMI contends, Revision I provided SMI with several options, and it exercised one of the options.

The purchase order states it is "for [a] new AVC Power Electronic System - VAR compensator" to be shipped to SMI in Seguin. It includes an order of "S&C 12 MVAR AVC power electronic system per attached quote dated April 13, 2005"[1] at a price of $299,750, plus $6750 "freight est." for a total of $306,500.

S&C sent a sales order acknowledgment to SMI dated August 25, 2005. Def. Ex. 8. It

---

[1] The purchase order has an "order date" of May 3, 2005 and a "change date" of May 16, 2005" but appears to have a fax date stamp of May 16, 2005. The purchase order states it is a purchase of "S&C 12 MVAr AVC power electronic system per attached quote dated April 13, 2005." The April 13, 2005 quote is actually Revision H, not Revision I. Revision H is very similar to Revision I except Item 1 in the pricing in Revision H is for the AVC "w/ off loading and installation" for $299,750" while Item 1 in the pricing in Revision I is for the AVC "w/o off loading or installation" for $306,500. Def. Ex. 4 & Ex. 5. There also appear to be minor changes in items 17 and 18 of the Scope of Work Table 2.

includes "PSS Provided Equipment," which is "PUREWAVE AVC ADAPTIVE VAR COMPENSATOR, 12 MVAR, COMPLETE WITH DI/DT REACTORS, CAPACITORS, IN TWO SETS OF NEMA 3R INDOOR ENCLOSURE" and "PSS SERVICES WITH PUREWAVE AVC," which includes "COMMISSIONING SERVICES/OPERATOR TRAINING TO INCLUDE ON-SITE SERVICES FOR EQUIPMENT START-UP/TESTING AND OPERATIONS TRAINING, INCLUDING TRAVEL AND EXPENSES." The Price for the "AVC System" was $299,750.00, the price for services included.

SMI contends that "the scope of the agreement is a disputed fact issue."[2] SMI argues that it accepted Revision I by agreeing to purchase items 1 and 2 identified in the pricing section of the proposal, and that S&C agreed to provide design and engineering services for the entire AVC system installed at SMI. SMI cites the testimony of Camarillo that S&C agreed to provide "design services" and "engineering services" that includes "everything that makes that system function" and "whatever engineering is going to be required on their part to design or to – to deliver a completely functional AVC System." Camarillo agreed it was not a turnkey proposal, which would include delivering and installing the equipment. SMI states its position is based on the terms of Revision I as well as the "dealings between the parties." This includes work done by S&C to portions of the system other than the AVC units to attempt to address overheating problems.

S&C argues that since SMI only bought the two AVC units from S&C, SMI was responsible for purchasing all other equipment and for installing the entire system, including the AVC equipment

---

[2] SMI contends that the issue of whether the parties reached an agreement is also disputed. However, it appears undisputed that the parties reached an agreement at least to the fact that SMI would pay for and S&C would manufacture and commission the two AVC units. Whether they agreed to additional contractual terms is disputed.

and all related electrical and mechanical connections. S&C asserts that, in January 2006, S&C personnel were on site at SMI to commission the two AVC units, and that commissioning was completed no later than January 31, 2006. SMI argues that commissioning was not completed, and that S&C's evidence does not establish that commissioning was completed. However, SMI's Complaint states that S&C "fully commissioned the AVC system on or about February 10, 2006." Second Am. Compl. ¶ 12; *see also* Third Am. Compl. ¶ 12.

S&C argues that, once commissioned, the AVC units corrected the voltage sag and produced sufficient VARs to correct the power level as intended. SMI disagrees that the units were working as intended. Both parties agree, however, that there were "heating issues" and the building housing the AVC units was hot. S&C personnel attempted to address the heating issues by changing air flow in the machines, installing more powerful fans in the units, and working with SMI to address air flow and air conditioning duct work in the building. SMI also complains of problems in May 2006 in the primary AVC unit and in November 2006 involving the secondary unit. On December 2, 2006, there was a fire in the building that has rendered the AVC units inoperable. In response to a request for a spoliation instruction by S&C, this Court has ordered that it must be stipulated that the fire originated in the underground cabling.

## II. Procedural Background

Plaintiff SMI, as well as an additional Plaintiff Commercial Metals, sued Defendant S&C Electric and Fred Oberlender and Associates. Defendants removed the case to this Court on December 11, 2009. On January 29, 2010, Plaintiff filed a First Amended Complaint that dropped Commercial Metals Company as a plaintiff and Fred Oberlender and Associates as a defendant, leaving only the claims by SMI against S&C Electric. Docket no. 24.

On April 29, 2010, SMI filed a Second Amended Complaint. Docket no. 28. It alleged that "SMI contacted S&C about purchasing a PureWave AVC Adaptive VAR Compensator (hereinafter, the 'AVC'), for use at the Seguin Mill," and that, according to S&C, the AVC would help regulate and stabilize the power flow throughout the Mill's operations. Plaintiff alleged that "[a]fter several months of discussions between SMI and S&C about the Seguin Mill's specific needs (and the exchange of several proposals), on April 15, 2005, SMI submitted a purchase order for an AVC system designed and tailored to fit SMI's specific needs. On May 4, 2005, after SMI submitted its purchase order, S&C provided SMI with a revised proposal [Revision I] for the AVC system."[3]

Plaintiff alleged that, "[a]s part of the contract, S&C agreed to provide engineering and manufacturing services needed for the AVC system, and once the system was in place, S&C agreed to provide start-up and commissioning services to confirm proper operation prior to turning over the AVC system to SMI. The agreed upon purchase price for the AVC System and the plans and specifications was $306,500." Plaintiff further alleged that, "[a]fter the building was constructed and the AVC system was installed, S&C went to the Steel Mill and inspected the system to ensure everything had been built and installed according to plan. S&C then proceeded to put the AVC system online and fully commissioned the AVC system on or about February 10, 2006."

Plaintiff alleged, however, that the AVC System never functioned properly, that on November 17, 2006, the AVC system experienced "a significant capacitor failure caused by the system overheating, which resulted in the AVC system having diminished capability" and on December 2, 2006, "there was a complete system failure resulting in a fire that destroyed the slave unit and the air

---

[3] Plaintiff's pleadings state that SMI submitted a purchase order on April 15, 2005, but the only purchase order in the record is dated May 16, 2005.

conditioning system of the AVC, and ultimately rendered the master unit of the AVC system unusable." Consequently, Plaintiff alleges, "after spending nearly $720,000.00 to purchase and install a fully functional AVC system manufactured by S&C, SMI was left with a burned building housing a partially destroyed and non-functional AVC system."

Plaintiff's breach-of-contract claim alleges: (1) the sales agreement between S&C and SMI constitutes a contract pursuant to which Defendant agreed to provide an AVC system that would properly and adequately function in accordance with its intended design, in exchange for SMI paying the agreed upon purchase price of $306,500; (2) SMI paid Defendant in full for the purchase of the AVC system; (3) however, the AVC system never worked according to its intended design, and experienced a number of failures, the last of which rendered the system unusable; (4) therefore, Defendant has breached the terms of its contract with SMI. Plaintiff also asserted claims for breach of express warranty in the sale of goods, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose.

The breach of express warranty claim stated: At the time of purchase, S&C individually, and acting by and through its duly authorized agent and representative, Fred Oberlender and Associates, Inc., in order to induce SMI, expressly warranted that the AVC system was properly designed and manufactured, and that it would work properly and according to its intended purpose. SMI relied on the Defendant's warranty of the AVC system, and this warranty became a part of the basis of the bargain between SMI and Defendant. However, the AVC system was not of the quality or condition expressly warranted by S&C and Fred Oberlender and Associates, Inc. As evidenced by the AVC system's repeated failures, Defendant failed to comply with the terms of the express warranty.

On September 16, 2011, S&C filed a motion for summary judgment, arguing that SMI's

breach-of-contract claim failed as a matter of law because the contract SMI alleges exists between the parties was never formed and because S&C complied with the terms of the only contract that was formed. In its response, SMI argued that the scope of the agreement between the parties is a disputed fact issue. In its reply, S&C also argued that the claim that the AVC units were defective is not a proper breach-of-contract claim, but is instead a breach-of-warranty claim. S&C cited Texas law that breach of contract and breach of warranty are distinct claims, citing a case in which this Court noted that "[o]nce a buyer has accepted the goods and can no longer revoke that acceptance, it is limited to recovering under section 2.714 of the UCC for breach of warranty if the goods are defective or nonperforming." Reply at 4 (quoting *Bro-Tech Corp. v. Purity Water of San Antonio*, 681 F. Supp. 2d 791, 796 n.4 (W.D. Tex. 2010)). S&C asserted that "SMI accepted the units, never revoked that acceptance, and indeed operated the commissioned units for nearly a year" and that "accordingly, any claim that SMI makes for AVC units that 'did not perform as promised' is a claim for a breach of warranty under the UCC, not a breach of contract claim." Docket on. 64 at 4.

The Court held a hearing on the summary-judgment motion on February 22. On March 19, 2012, this Court entered an order granting in part and denying in part the motion for summary judgment. The Court cited the language of Plaintiff's breach-of-contract claim in the complaint and noted that SMI was not alleging that S&C failed to make delivery or failed to perform any of the contracted-for items, but alleged only that the units and design system were defective. Thus, whatever the parties contractually agreed to, SMI's pleadings complained only of defective performance after delivery as opposed to a failure to deliver or perform, and thus the breach-of-contract claim was

"inappropriate."[4] The Court further held, however, that material fact issues existed on the breach-of-warranty claims and denied summary judgment on those claims.

On April 4, the Court granted SMI leave to file a Third Amended Complaint. The Third Amended Complaint was filed in response to the Court's order on the motion for summary judgment, and amended the breach-of-express warranty claim to include both goods and services (the prior complaint asserted the express warranty claim only as to the sale of goods). The factual allegations remained the same. The express warranty claim alleged in the Third Amended Complaint states that S&C "expressly warranted that the AVC system was properly designed and manufactured, and that it would work properly and according to its intended purpose after S&C commissioned the AVC system"; that "its commissioning services would 'confirm the operation of the equipment and overall system performance"; that "SMI relied ... on the warranty of the AVC system and the services it would perform, and this warranty became a part of the basis of the bargain"; and "the AVC system was not of the quality or condition expressly warranted by S&C . . . nor were its services."

On April 10, Defendant sought a continuance to conduct additional discovery and submit dispositive motions on the amended claim. The Court granted the motion. On June 22, S&C filed the instant motion for summary judgment on Plaintiff's warranty claims. The motion argues that, insofar as Plaintiff amended the complaint to assert primarily claims about services, the contracts are no longer governed by the UCC, and therefore all implied warranty claims must be dismissed because they are not viable under Texas common law.

---

[4] SMI has moved for reconsideration of that order, arguing that it was not given sufficient notice of this possible basis for summary judgment, and asserting that fact issues remain as to whether it finally accepted the AVC system or rejected/revoked acceptance. That motion will be addressed in a separate order.

### III. Analysis

Originally, S&C took the position that this was a contract for the sale of goods and that it was therefore governed by the UCC. SMI originally argued that it was not clear whether this was a contract for the sale of goods or whether it was predominately for services, and that this could not be determined until the exact nature of the contract was determined. In the second motion for summary judgment, however, S&C contends that the amendments in the Third Amended Complaint make this a contract for services that is not governed by the UCC. Although the Court agrees that fact issues remain concerning exactly what the parties contractually agreed to, the Court can determine whether, even considering the facts alleged by SMI to be true, the agreement is for the sale of goods.

The UCC applies to transactions "in goods," which are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." TEX. BUS. & COM. CODE § 2.102. This definition is broad. *Propulsion Technologies, Inc. v. Attwood Corp.*, 369 F.3d 896, 900 (5th Cir. 2004). Under the Code, manufacture-and-sale contracts are not even considered "hybrid" contracts; rather, by the statutory definition, a transaction in "goods" includes the seller's manufacture and sale of products. *Id.* at 901. The fact that a manufactured item is custom designed for the buyer's needs and is not readily marketable to others is not dispositive – manufactured goods are still "goods." *Id.* Further, manufacture always involves some services, such as engineering, design, fabrication, and inspection. *Id.* The fact that the goods are not in existence at the time of the execution of the contract does not change their status as goods. *Id.*

In some instances, a contract may be a hybrid contract involving the sale of both services and materials. In such cases, the question becomes whether the dominant factor or essence of the transaction is the sale of materials or of services. *Propulsion Tech.*, 369 F.3d at 901; *see also*

*Pittsburgh-Des Moines Steel v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 n.6 (7th Cir. 1976) (approving of a test to determine whether the goal was the rendition of service with goods incidentally involved, or a sale and purchase of "movable things," with labor or services incidentally involved). Contracts to install flooring, install a drainage system, to build a house, to complete a chimney, to construct or install a swimming pool or a shingled roof are all considered to be primarily for the rendition of services, with goods being only incidental. *Propulsion Tech.*, 369 F.3d at 902. The important aspect is "some installation or construction to be completed by the seller after delivery," and courts in those situations have concluded that the service element of installing or constructing predominated. *Id.* at 901-02. However, even where the production of goods is labor intensive and the cost of goods is relatively inexpensive, such as for wedding photographs or custom computer software, courts have considered the contracts for production and delivery to be transactions predominately in "goods" because the contract was not sufficiently service oriented. *Id.* at 902. The focus is on what the seller is providing.

In *Propulsion Technologies*, the Fifth Circuit relied on the fact that the contract repeatedly pointed to the fact that it was for manufacture and delivery of a product and its purpose was to describe the terms of the seller's production and required the seller to warrant the propellers against defects in materials and workmanship. These elements contemplated that the key element was not services but products or goods. The only provisions related to services were the requirements for quality standards. Other factors the court considered were that the letter called the buyer a "customer" (which signals a transaction in goods) and that the seller was paid per casting (the court noted that contracts that charge for goods without a charge for installation are for goods), as well as the fact that movable goods were involved.

13

In *Tarrant County Hospital District v. GE Automotive Services, Inc.*, 156 S.W.3d 885 (Tex. App.–Fort Worth 2005, no pet.), the buyer contracted with the seller to design, supply, and install a power supply system for a hospital. Although the court acknowledged that the contract was for both goods and services, the court noted that the contract documents between the parties state that the bid package was a "product purchase" for electrical distribution and thus the sale of goods was the dominant factor or essence of the transaction between the parties.

S&C argues that, following summary judgment, "SMI amended its complaint to recharacterize entirely the transaction between the parties." However, SMI's allegations concerning what was contracted for have not changed in the Third Amended Complaint. SMI still alleges that it purchased an "AVC system and the plans and specifications for $306,500.00" and that "S&C agreed to provide engineering and manufacturing services needed for the AVC system, and once the system was in place, S&C agreed to provide start-up commissioning services to confirm proper operation prior to turning over the AVC system to SMI." The only thing that has changed is that SMI now includes express warranty claims based on the services in addition to the goods. Further, whereas before SMI said it was unclear whether the UCC applied to the contract, SMI now alleges that its alleged contract is governed by the UCC.

It appears undisputed that, if the contract is simply for the purchase of the two AVC units, to be designed and manufactured by S&C, and related commissioning (as argued by S&C), the contract is one for goods under the UCC. The question then is whether the addition of "design and engineering" services related to the entire AVC system package described in Revision I, which SMI argues was also part of the contract, makes this contract in essence one for services. The Court concludes that, even under the contract alleged to exist by SMI, the contract is in essence one for

14

goods and is therefore governed by the UCC.

Although SMI asserts that it ultimately purchased a "system" that was required to be designed and engineered, the "system" itself was composed of movable goods, and the design and engineering was part of creating this system and ensuring that the equipment manufactured by S&C would perform as desired. SMI originally approached S&C about purchasing equipment. S&C offered to provide that equipment, along with a "system package" of other items intended to be used with the AVCs, as well as installation of the system package. SMI ultimately purchased the equipment (the AVCs) with services incidental to that equipment. The exact nature of the services SMI purchased is disputed, but even assuming it includes the design/engineering and specifications for the entire system package, the essence of the contract was still for the goods — the AVC units.

Henry Camarillo himself summarized the case as follows: "[Plaintiff] bought a piece of equipment to perform a certain function. S&C supplied the equipment they promised would perform that function. The equipment failed. It did not perform as indicated in the proposal or as promised." Camarillo Jan. 26, 2011 dep at 35. Camarillo added that Plaintiff was "suing for all the equipment that it required to make the AVC function" because the system would not function without those pieces of equipment. *Id.* at 36. Further, SMI itself has implicitly acknowledged from the onset that this was a contract for goods governed by the UCC by asserting a claim for "breach of express warranty in the sale of goods," as well as breach of implied warranties under the U.C.C. *See* Second Am. Compl. ¶¶ 20, 22 (citing TEX. BUS. & COM. CODE ¶¶ 2.314, 2.315). S&C has also always asserted that this was a contract for the sale of goods, and the fact that SMI has changed the allegations in its express warranty claim does not change the underlying nature of the transaction.

The Court concludes that, as a matter of law, the essence of this contract was the purchase of

goods. Plaintiff's claims related to services are essentially that S&C designed and specified the other portions of the "system" that were required or recommended for use with its manufactured products (the two AVC units), in order for the AVC units to function as intended and warranted. It was never SMI's purpose to obtain design or engineering services for these other portions of the system; rather, SMI sought the AVC units, and these were specifications and designs provided by S&C as elements of a system solution based around the two AVC units.

Based on the language of the proposal revisions, the purchase order, and the parties dealings, the Court concludes that this was a contract for the sale of goods governed by the UCC. As such, the UCC applies to the entire contract. *See* White & Summers, Uniform Commercial Code § 9-2 ("If the hybrid transaction is predominately for the sale of goods, then the UCC will apply to the entire transaction, including the services portion."); *Reynolds Metals Co. v. Westinghouse Electrical Corp.*, 758 F.2d 1073, 1079 n.7 (5th Cir. 1985) (applying UCC to contract for the sale of electrical transformer although the claim concerned installation services because "there was but one contract, and that contract was primarily for the sale of goods"). Accordingly, S&C's second motion for summary judgment (docket no. 92), which is premised on the argument that the contract is not governed by the UCC, is denied.

It is so ORDERED.

SIGNED this 16th day of October, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE