UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| STRUCTURAL METALS, INC., § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | Civil Action No.  SA-09-CV-984-XR |
| § | |
| S&C ELECTRIC COMPANY, § | |
| § | |
| *Defendant*. § | |

**ORDER**

On this date, the Court considered Plaintiff Structural Metal's Motion to Reconsider Entry of Summary Judgment on its Breach of Contract Claim (docket no. 95).  After careful consideration, the Court will grant the motion.

**I. Background**

Plaintiff Structural Metals Inc. ("SMI") owns and operates a steel mill and a recycling plant in Seguin, Texas.  SMI contacted Defendant S&C Electric about purchasing certain equipment to solve some of the energy supply needs for its operations.  The parties negotiated the deal over a long period of time, and S&C sent a number of revised proposals to SMI.  The parties dispute the extent of the agreement ultimately formed.

SMI's Second Amended Complaint alleged that "SMI contacted S&C about purchasing a PureWave AVC Adaptive VAR Compensator (hereinafter, the 'AVC'), for use at the Seguin Mill," and that, according to S&C, the AVC would help regulate and stabilize the power flow throughout the Mill's operations.  Plaintiff alleged that "[a]fter several months of discussions between SMI and

S&C about the Seguin Mill's specific needs (and the exchange of several proposals), on April 15, 2005, SMI submitted a purchase order for an AVC system designed and tailored to fit SMI's specific needs. On May 4, 2005, after SMI submitted its purchase order, S&C provided SMI with a revised proposal [Revision I] for the AVC system."[1]

Plaintiff alleged that, "[a]s part of the contract, S&C agreed to provide engineering and manufacturing services needed for the AVC system, and once the system was in place, S&C agreed to provide start-up and commissioning services to confirm proper operation prior to turning over the AVC system to SMI. The agreed upon purchase price for the AVC System and the plans and specifications was $306,500. SMI was required to make considerable expenditures in infrastructure in order to accommodate the AVC, all as specified by S&C . . . ." Plaintiff further alleged that, "[a]fter the building was constructed and the AVC system was installed, S&C went to the Steel Mill and inspected the system to ensure everything had been built and installed according to plan. S&C then proceeded to put the AVC system online and fully commissioned the AVC system on or about February 10, 2006."

Plaintiff alleged, however, that the AVC System never functioned properly, specifically that it "never functioned according to its intended design and scope, and constantly overheated"; "the system experienced several notable failures within its first year of operation because of overheating"; and "the overheating problem ultimately resulted in a fire that rendered the AVC system completely inoperable." Plaintiff alleged that it was "in constant communication with S&C about the system failures and the overheating problems that were experienced from the time that the system was

---

[1] Plaintiff's pleadings state that SMI submitted a purchase order on April 15, 2005, but the only purchase order in the record is dated May 16, 2005.

commissioned." Plaintiff alleged that S&C sent it a letter on November 6, 2006, acknowledging the overheating problems with the AVC system and promising to remedy the situation. S&C promised to make modifications to the AVCs, re-calibrate the system, and insure that the AVC was fully functional. It also agreed to extend "the express contractual warranty on the AVC system."

However, Plaintiff alleged, on November 17, 2006, the AVC system experienced "a significant capacitor failure caused by the system overheating, which resulted in the AVC system having diminished capability" and on December 2, 2006, "there was a complete system failure resulting in a fire that destroyed the slave unit and the air conditioning system of the AVC, and ultimately rendered the master unit of the AVC system unusable." Consequently, Plaintiff alleged, "after spending nearly $720,000.00 to purchase and install a fully functional AVC system manufactured by S&C, SMI was left with a burned building housing a partially destroyed and non-functional AVC system." SMI also alleged that it "requested that S&C honor its warranty and repair the AVC system in accordance with its intended use," but instead, S&C proposed to furnish another PureWave AVC System that would operate together with part of the existing AVC system.

The Second Amended Complaint further alleged that, "[w]ithin a reasonable time after SMI's discovery of the defective quality of the AVC system, SMI notified S&C of the breach of warranty" but "Defendant has neither cured nor otherwise satisfied SMI's complaints and objections." It further alleged that "all conditions precedent to SMI's right to recovery for breach of contract and/or breach of warranty have been performed or have occurred."

On September 16, 2011, S&C filed a motion for summary judgment, arguing that SMI's breach-of-contract claim failed as a matter of law because the contract SMI alleges exists between the parties was never formed and because S&C complied with the terms of the only contract that was

formed.  S&C argued that it contracted to do two things: (1) supply two AVC units to SMI; and (2) commission those two units after SMI installed them.  S&C asserted that it did both of those things, and thus it was entitled to summary judgment as a matter of law on the breach-of-contract claim. S&C further moved for summary judgment on Plaintiff's breach of express warranty and breach of implied warranty claims.

In its response, SMI argued that the scope of the agreement between the parties is a disputed fact issue, and denied that it only purchased the two AVC units and commissioning of those units. Instead, SMI argued, based on the terms of Revision I and the dealings between the parties, S&C agreed to provide design and engineering services for the entire AVC system installed at SMI's facility.  SMI argued that the equipment did not perform as promised and that "design and installation errors by S&C contributed to overheating of the compensators and concluded with two fires."

In its reply, S&C again argued that there was only one contract – to sell and commission two AVC units, with which it complied.  S&C argued that there was no contract to provide design and engineering services, and that SMI changed its focus because it had to admit that the fire was caused in the cables, which SMI chose and installed.

S&C also argued that the claim that the AVC units were defective is not a proper breach-of-contract claim, but is instead a breach-of-warranty claim.  S&C cited Texas law that breach of contract and breach of warranty are distinct claims, and cited a case in which this Court noted that "[o]nce a buyer has accepted the goods and can no longer revoke that acceptance, it is limited to recovering under section 2.714 of the UCC for breach of warranty if the goods are defective or nonperforming."  Docket no. 64 at 4 (quoting *Bro-Tech Corp. v. Purity Water of San Antonio*, 681 F. Supp. 2d 791, 796 n.4 (W.D. Tex. 2010)).  S&C asserted that "SMI accepted the units, never

4

revoked that acceptance, and indeed operated the commissioned units for nearly a year" and that "accordingly, any claim that SMI makes for AVC units that 'did not perform as promised' is a claim for a breach of warranty under the UCC, not a breach of contract claim." *Id.*

On February 22, this Court held a hearing on the motion for summary judgment and other motions. In arguing the motion for summary judgment, S&C repeated its position that the only contract was for purchase and commissioning of the two AVC units, and also argued that the only complaints were for defects in delivered and accepted (non-rejected) goods, such that SMI's claims were properly characterized as only for breach of warranty. S&C also argued that the commissioning services were not covered by the UCC and that the claim related to commissioning was time-barred.[2]

In response, SMI argued that, before it would accept the equipment, S&C had to show it was operating appropriately, but S&C never did that.[3] SMI further argued that the AVC system never functioned properly and "we finally said we don't want it." SMI argued that if S&C commissioned the system, it did not commission it to the point that it was performing in accordance with their promises.

The parties filed post-hearing briefs on the motion for summary judgment on February 24 (S&C), February 29 (SMI), and March 1 (S&C). SMI argued that, regardless of whether the claim

---

[2] Counsel for S&C argued, "Because they didn't breach the sales agreement and as Your Honor said, in the *Bro-Tech* case this [is not] a breach of contract case . . . when like here S&C delivers the goods and [there is] no rejection of them, it is a breach of warranty . . . and the plaintiff is then limited to recovering breach of warranty damages. Not a contract case . . . . So this really isn't a breach of contract case."

[3] Counsel for SMI stated, this is "a complicated piece of equipment that the defendant said they would deliver to Commercial Metals and commission, and we will come back to that in a moment, before we would accept this piece of equipment, before we would say, your job is done, they had to assure us that the job -- that the equipment was operating appropriately, they never did that."

was a breach of contract or breach of warranty, the remedies for those causes of action can be identical. And although it recognized that breach of contract and breach of warranty are distinct claims, SMI provided no briefing in response to S&C's argument that SMI had finally accepted the AVC system and thus was limited to asserting a breach-of-warranty claim.

On March 19, 2012, this Court entered an order granting in part and denying in part the motion for summary judgment. The Court cited the language of Plaintiff's breach-of-contract claim in the complaint and noted that SMI was not alleging that S&C failed to make delivery or failed to perform any of the contracted-for items, but alleged only that the units and design system were defective. Thus, it appeared to the Court that, whatever the parties contractually agreed to, SMI's pleadings alleged only a breach-of-warranty claim, and the breach-of-contract claim was "inappropriate." The Court further held, however, that material fact issues existed on the breach-of-warranty claims and denied summary judgment on those claims.

On March 27, the parties submitted a joint pretrial order and proposed jury instructions. SMI's proposed jury instructions did not include a breach-of-contract question but did include a question asking whether SMI rejected or revoked acceptance of the AVC system. This question was included as a predicate for SMI to recover damages under § 2.711 of the UCC. Docket no. 78. In addition, SMI listed as a disputed issue of fact in the joint pretrial order "Whether Structural Metals accepted the AVC system." S&C objected that this was a disputed issue in light of the Court's ruling on summary judgment, contending that "the Court's conclusion that S&C did not breach the sales contract includes a finding that a contract had been formed and consequently that Structural Metals had accepted the goods." Docket no. 76.

On April 2, SMI filed an opposed motion for leave to file a Third Amended Complaint. The

Third Amended Complaint was filed in response to the Court's order on the motion for summary judgment, and amended the breach-of-express warranty claim to include both goods and services (the prior complaint asserted the express warranty claim only as to the sale of goods). The factual allegations remained the same. Although SMI moved for leave to amend the complaint in response to the Court's summary-judgment order, SMI did not challenge the Court's order or seek reconsideration.

On April 4, the Court conducted a pretrial conference in anticipation of the upcoming trial. At the pretrial conference, the Court granted Plaintiff's Motion for Leave to File Third Amended Complaint. At the hearing the Court made clear that the summary judgment order did not preclude a claim based on services. On April 10, Defendant sought a continuance to conduct additional discovery and submit dispositive motions on the amended claim. The Court granted the motion. On June 22, S&C filed an additional motion for summary judgment on Plaintiff's warranty claims. That motion argued that, insofar as Plaintiff amended the complaint to assert primarily claims about services, the contract was no longer governed by the UCC, and therefore all implied warranty claims must be dismissed because they are not viable under Texas common law.

On July 6, SMI filed a motion for reconsideration of the Court's order granting summary judgment on the breach-of-contract claim. SMI argues that the Court's conclusions are based on the assumption that SMI finally accepted the goods and services, but that fact issues exist as to whether SMI accepted the goods and services or rejected or justifiably revoked acceptance of such goods and services. SMI argues that it did not have an adequate opportunity to address this issue before summary judgment was entered. S&C objects to the motion as untimely since it was filed four months after the Court's order and raises arguments and facts that could have been (and were) raised

before the Order was entered. Last, S&C argues that SMI's arguments that it rejected or revoked acceptance is unfounded because it did not provide "explicit" and "clear and unambiguous" notice.

## II. Analysis

On October 16, this Court denied S&C's second motion for summary judgment, concluding that the contract is one for goods governed by the UCC. At the time it granted summary judgment on Plaintiff's breach-of-contract claim, however, the Court had not yet ruled whether the contract was governed by the UCC or by the common law.

Under both the U.C.C. and Texas common law, there is a distinction between breach of warranty and breach of contract. Courts and commentators have noted that "breach of contract and of warranty remedies are mutually exclusive." *A.O. Smith Corp. v. Elbi S.P.A.*, 123 Fed. Appx. 617, 619 (5th Cir. 2005); Anderson on the UCC § 2-714 ("While a breach of contract action is available to a buyer where the seller fails to make delivery, only a breach of warranty action is available to a buyer who has accepted goods that turn out to be nonconforming. The two actions are mutually exclusive."). In its order on summary judgment, the Court relied on Texas case law discussing this distinction and on SMI's pleadings.

In *Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991), the Texas Supreme Court stated that "breach of contract damages are available for failure to perform, but not for delivery of nonconforming goods" and "remedies for breach of warranty are generally available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner, while remedies for breach of contract are available to a buyer when the seller fails to make delivery." Following this reasoning, courts have broadly stated that "failure to conform is a breach of warranty; whereas failure to deliver is a breach of contract." *Ellis v. Precision Engine*

*Rebuilders, Inc.*, 68 S.W.3d 894, 897 (Tex. App.–Houston [1st Dist.] 2002, no pet.). Thus, in *Ellis*, the court stated that "breach of contract damages are available for failure to perform, but not for delivery of non-conforming goods" and "[b]ecause [the plaintiff's] claim [was] based on the receipt of defective goods, he [had] a breach of warranty cause of action, not a breach of contract case." *Id.* Similarly, in *ALCAN Aluminum Corp. v. BASF*, Civ. A. No. 3:97-CV-1480, 2001 WL 1338372 (N.D. Tex. Oct. 17, 201), the court stated that "delivery of inferior goods or services equate to a warranty claim while delivery of nothing equates to a contract claim." *Id.* at *7.

However, by focusing only on defective performance versus failure to perform, this broad language fails to place appropriate emphasis on whether the goods and/or performance have been finally accepted. Although a failure to deliver or perform gives rise to a breach-of-contract claim, whether delivery of non-conforming goods or performance gives rise to breach-of-warranty or breach-of-contract remedies depends on whether the buyer has accepted the goods despite the nonconformity. *See Contractor's Source, Inc. v. Hanes Companies, Inc.*, Civ. A. No. 09-CV-0069, 2009 WL 6443116 (S.D. Tex. Dec. 29, 2009) (noting that the case law "is murkier, and somewhat contradictory" in the case of delivery of non-conforming goods).

Although the case law is murky, the UCC is clear: With regard to delivered but non-conforming goods, the buyer's remedies under the UCC are determined by whether the buyer has accepted the goods. *Compare* TEX. BUS. & COM. CODE § 2.711 (providing buyer's remedies "where the . . . buyer rightfully rejects or justifiably revokes acceptance" *with* § 2.714 (providing "buyer's damages for breach in regard to accepted goods"); *Leifester v. Dodge Country, Ltd.*, Civ. A. No. 03-06-00044, 2007 WL 283019 (Tex. App.–Austin 2007, no pet.) ("Whether a buyer has the right to revoke his acceptance impacts the kinds of damages he may recover for breach when goods are non-

9

conforming."). Under the UCC, acceptance and retention of the goods is a prerequisite to bringing a claim for breach of warranty. *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.*, 832 F.2d 1358, 1375 (5th Cir. 1987) ("[U]nder the system the [UCC] sets up, a buyer's ability to sue for breach of warranty arises only under section 2.714, where acceptance of nonconforming goods is a prerequisite."); *Materials Mktg. v. Spencer*, 40 S.W.3d 172, 174 (Tex. App.–Texarkana 2001, no pet.) (warranty actions by their nature will occur after acceptance of the goods). And, when a buyer finally accepts non-conforming goods, his remedy is primarily for breach of warranty. [4]

In deciding the motion for summary judgment, the Court's primary focus was on the fact that SMI was complaining about defects in the goods as opposed to non-delivery or a failure to perform. The Court did not focus on the issue of acceptance because, based on the allegations in Plaintiff's Second Amended Complaint, it appeared that SMI had accepted the goods and was electing to sue for breach of warranty under an "acceptance theory of recovery." *See HCI Chemicals (USA), Inc. v.*

---

[4] There is also some ambiguous case law language about whether breach-of-contract damages may be pursued at all once a buyer accepts non-conforming goods. *See A.O. Smith*, 123 Fed. Appx. at 620 ("[B]reach of contract damages are not available when a buyer accepts non-conforming goods. In that instance, breach of warranty is the remedy."). However, the terms of the UCC and commentaries indicate that the buyer may still sue for breach-of-contract damages for breaches that do not amount to breaches of warranty. *See* TEX. BUS. & COM. CODE § 2.714(a) ("Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."); *Id.* Comment 2 ("The 'non-conformity' referred to in subsection (1) includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract.); 14 Williston on Contracts § 40:38 (4th ed.) ("Where the nonconformity does not involve a breach of warranty, recoverable damages may be computed in any reasonable manner."). Commentators indicate that, under § 2.714, damages for nonconformities that relate to quality and constitute a breach of warranty are generally measured by the formula in § 2.714(b). The buyer may also sue for other breaches, such as late delivery or an insufficient quantity, under § 2.714(a).

*Henkel KgaA*, 966 F.2d 1018 (5th Cir. 1992) (distinguishing among damages remedies under the UCC based on whether the plaintiff was pursuing an acceptance theory of recovery or a rejection theory of recovery). The Complaint alleged that S&C fully commissioned the AVC units, but that the system did not work as intended. Further, other aspects of the pleadings indicated that SMI was seeking to recover on a breach-of-warranty theory premised on acceptance of the goods. In paragraph 17, it alleged that it requested S&C to honor its warranty. In paragraph 24, it alleged that "SMI notified S&C of the breach of warranty." Although it also alleged that "all conditions precedent to SMI's right to recovery for breach of contract and/or breach of warranty have been performed or have occurred," it did not expressly assert that the goods had been rejected or that acceptance had been revoked. Last, SMI's breach-of-contract claim allegations complained only of non-conformity in terms of not performing in accordance with its intended design (thus sounding in breach of warranty) as opposed to any failure to perform, and there did not appear to be any breach or non-conformity that did not involve a breach of warranty.[5] Thus, because the pleadings were clearly asserting breach of warranty claims, for which acceptance is a pre-requisite, the allegations related to the breach-of-contract claim related only to breach-of warranty types of non-conformity, and the pleadings did not clearly indicate any rejection or revocation of acceptance, the Court concluded that the breach-of-contract claim was "inappropriate."

However, as noted, under the UCC, with regard to delivered but non-conforming goods[6], the

---

[5] *See Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073 (5th Cir. 1985) (even with regard to accepted goods, buyer permitted to sue for breach of contract where services delivered/performed were so deficient as to equate to a failure to deliver/perform).

[6] The Court refers to "goods," but notes that, under the UCC, non-conformity may relate to both goods and conduct/performance under the contract. *See* TEX. BUS. & COM. CODE § 2.106(b) ("Goods or conduct including any part of a performance are 'conforming' or conform to the contract

critical factor in determining the remedies available to the buyer is whether the buyer has finally accepted the goods, not whether the buyer is complaining about defects or non-conformities. *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.–Dallas 2003, no pet.). "Only after the buyer finally accepts and can no longer revoke his acceptance, is he limited to recovering under section 2.714. If the seller tenders non-conforming goods, the buyer may reject them, or he may later revoke his acceptance under section 2.608 if the non-conformity was difficult to discover before acceptance. A buyer who rightfully rejects the goods or justifiably revokes his acceptance may recover breach of contract remedies for delivery of non-conforming goods under section 2.711, including 'recovering so much of the price as has been paid.' Alternatively, the buyer may accept the goods despite the non-conformity and recover damages for the non-conformity, including breach of warranty, plus incidental and consequential damages." *Id.* at 834. Whether a buyer has accepted goods or has rejected/revoked acceptance is generally a fact issue for the jury.

In considering the motion for reconsideration, the Court has located case law indicating that SMI's Second Amended Complaint was sufficient to support a rejection/revocation theory of recovery. In *Emerson Elec. Co. v. Am. Permanent Wave Co.*, 201 S.W.3d 301 (Tex. App.–Dallas 2006, no pet.), the court of appeals held that pleadings that stated that goods were defective, advised defendant of failures and associated costs, and requested that defendant reimburse plaintiff for expenses incurred as a result of the defect were sufficient notice of rejection/revocation of acceptance. SMI's complaint contains similar allegations. Although it could have been clearer, those allegations, coupled with Plaintiff's assertion of a breach-of-contract claim, the allegation that all "conditions precedent" to a breach-of-contract claim had been satisfied, and the request for a return of the

---

when they are in accordance with the obligations under the contract."

purchase price, were sufficient to give notice of a rejection/revocation theory.[7]

Further, a plaintiff may proceed to trial on both breach-of-contract and breach-of-warranty claims (or acceptance and rejection/revocation theories) with regard to the same goods, *see, e.g.*, *A.O. Smith v. Elbi S.P.A.*, 123 Fed. Appx. 617 (5th Cir. 2005), and SMI alleged its contract and warranty claims both in the conjunctive and the disjunctive. Accordingly, the Court erred in concluding that SMI did not plead a rejection/revocation theory of recovery. Having concluded that SMI pled a rejection/revocation theory of recovery, the Court must consider whether summary judgment was nevertheless appropriate on the issues on rejection and/or revocation.

The argument that SMI had finally accepted the goods was first raised in S&C's reply brief, and courts often refuse to consider arguments first raised in a reply brief. *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 Fed. App'x 307, 315 (5th Cir. 2008) ("It is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs."). Although S&C also mentioned this argument at the summary-judgment hearing, this issue was only briefly addressed at the hearing and was never a focus of discussion. Nevertheless, SMI did argue that it did not accept the goods because commissioning was not properly completed, and also noted that Camarillo had told S&C that SMI wanted its money back. In its motion for reconsideration, SMI also points to the fact that the nonconformity was not cured and that SMI was in constant communication with S&C about the problems and was assured that it would be remedied.

A buyer accepts goods if he agrees to accept them despite their defect or nonconformity, he

---

[7] In the context of delivery of nonconforming goods, rejection/revocation is a component of/pre-requisite to a breach-of-contract claim. *Emerson Elec.*, 201 S.W.3d 301, 310 (Tex. App.– Dallas 2006, no pet.); *Leifester*, 2007 WL 283019, at *4. Further, although the "damages" section of the complaint appeared to request only breach-of-warranty damages, the prayer did include a request for return of the purchase price (a breach-of-contract remedy under § 2.711).

fails to make an effective rejection, or he does any act that is inconsistent with the seller's ownership in the goods. *Toshiba Machine Co. v. SPM Flow Control*, 180 S.W.3d 761, 771 (Tex. App.–Fort Worth 2005, no pet.). Payment tends to indicate acceptance, but it is not conclusive. *Trident Steel Corp. v. Wiser*, 223 S.W.3d 520, 526 (Tex. App.–Amarillo 2006, pet. denied). Under § 2.602(a), rejection must be within a reasonable time after delivery and is ineffective unless the buyer seasonably notifies the seller. The notice envisioned by § 2.602 must be "clear and unambiguous." *HCI Chemicals (USA), Inc. v. Henkel KgaA*, 966 F.2d 1018, 1023 (5th Cir. 1992).

The Fifth Circuit held in *HCI* that the buyer must clearly and unambiguously notify the seller that it would not accept the chemicals and that the buyer's informing the seller that the buyer intends to hold it responsible for costs and damages suggests acceptance rather than rejection. S&C contends that SMI never sent a notice to anyone at S&C. However, there was evidence that Camarillo gave S&C a deadline to address the problems and eventually told S&C that SMI wanted its money back, which when viewed in light of the fact that the AVC System had been destroyed, is sufficient to raise a fact issue on rejection.

Even after goods are accepted, the buyer may have a right to revoke its acceptance. A buyer who revokes acceptance has the same rights and duties with regard to the goods involved as if he had rejected them. TEX. BUS. & COM. CODE § 2.608(c). "Unlike a claim of warranty that seeks a fix for defective goods or damages, a revocation seeks to put the buyer in the same position as if he had rejected the goods at the time of delivery." *Neal v. SMC Corp.*, 99 S.W.3d 813, 816 (Tex. App.–Dallas 2003, no pet.).

Section 2.608 of the UCC describes the conditions necessary for revocation: "The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its

value to him if he has accepted it (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." TEX. BUS. & COM. CODE § 2.608(a). Thus, this section recognizes a buyer's right to revoke when use of the goods reveals a latent defect. Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it. *Id.* § 2.608(b).

Whether a buyer has complied with the requirements of § 2.608 in giving adequate notice of revocation of acceptance is a question for the trier of fact. *A.O. Smith Corp.*, 123 Fed. App'x at 621. Generally, a buyer revoking goods must discontinue their use, but "continued use of non-conforming goods does not, in all case, waive the revocation of acceptance." *Id.* at 620. Revocation is determined on a case-by-case basis, with reasonableness of post-revocation use being the underlying consideration, taken in conjunction with a consideration of all the other elements necessary to effect a justifiable revocation. *Id.* (citing *Bellsouth Telesensor v. Information Systems & Networks Corp.*, 65 F.3d 166 (4th Cir. 1995)). The UCC does not prescribe any particular form or content that the notice of revocation must take, does not require it to be in writing, and does not require that the notice be accompanied by a refund demand or an offer to return the goods. 14 Williston on Contracts § 40:31. "Most courts would require that the notice sufficiently indicate to the seller that the buyer has revoked acceptance, identify the goods that are the subject matter of the revocation, and at least the general nature of the nonconformity." *Id.* The notice must be more than just mere notice of the breach. *Id.*

In *Purnell v. Guaranty Bank*, 624 S.W.2d 357 (Tex. App.–Dallas 1982, writ ref'd n.r.e.), the

court held that the mere lapse of thirty months was not an unreasonable time for revocation as a matter of law. The determination of whether the actions of the buyer amount to acceptance or an effective rejection in a particular case is generally made by the trier of fact. The Court finds that fact issues exist regarding whether SMI finally accepted the AVC system, and that summary judgment on the breach-of-contract claim premised on a rejection/revocation theory is not appropriate.

The Court agrees with S&C that SMI should have filed its motion to reconsider sooner than four months after the Court's ruling. However, the Court has the power to reconsider its own interlocutory orders even absent such a motion. The Court based its ruling on its construction of the pleadings as opposed to the issue of acceptance. The issue of acceptance is highly important to determining a buyer's remedies under the UCC, and this issue is even more important given the Court's recent holding that the contract at issue here is governed by the UCC. The Court will therefore grant the motion for reconsideration. As a result, Plaintiff may wish to withdraw its Third Amended Complaint, and the parties should be prepared to discuss this issue at the pretrial conference.

It is so ORDERED.

SIGNED this 22nd day of October, 2012.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE