UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| STRUCTURAL METALS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-09-CV-984-XR |
| | § | |
| S&C ELECTRIC COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

**ORDER**

On this date, the Court considered Plaintiff SMI's Motion for Entry of Final Judgment (docket no. 141) and Defendant S&C's Motion for Judgment as a Matter of Law or in the alternative Rule 59(e) Motion for Remittitur (docket no. 142).  After careful consideration, the Court will grant Plaintiff SMI's Motion for Entry of Final Judgment and will deny Defendant S&C's motion.

**Analysis**

Plaintiff moves for entry of final judgment on the jury verdict finding that Defendant S&C breached express and implied warranties and awarding damages in the amount of $306,500.00. Plaintiff SMI further seeks an award of prejudgment interest at a rate of 5%, beginning November 12, 2009, the date suit was filed.  Defendant moves for judgment as a matter of law on the ground that SMI failed to provide evidence of the value of the goods at the time and place of acceptance, and thus there is no evidence to support the jury's damage award for breach of warranty.  Defendant also contends that the collateral source rule does not apply in breach-of-warranty actions, and that the jury award should be remitted by the amount of insurance payments SMI received ($275,650).  S&C

1

Case 5:09-cv-00984-XR   Document 149   Filed 03/07/13   Page 2 of 13

argues that, even if the Court does not remit the damages by the amount of the insurance payment, it must still reduce the principal by the amount of the insurance payment when calculating the amount of prejudgment interest due.

**A. Breach of Warranty Damages**

The parties agree that the appropriate measure of damages for Plaintiff's breach-of-warranty claims is set forth in § 2.714(b), and that is the measure of damages that was submitted to the jury. Section 2.714(b) provides, "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."[1]  The jury awarded $306,500, which was the purchase price of the AVC units.

Defendant S&C argues that there is no evidence to support the jury's damage award of $306,500 because SMI did not provide evidence that the value of the goods at the time and place of acceptance was zero. To the contrary, Defendant contends, the evidence shows that the AVC units were not worthless because they functioned for nearly ten months. Plaintiff responds that it did provide sufficient evidence that the value of the AVC units was zero and that no consumer would purchase the AVC system as accepted by SMI.

"If an article sold and warranted has some value, the complaining party is not entitled to recover the full amount he has paid, but is limited to the difference in value [between the article as

---

[1]The parties agree that the purchase price is an accurate indicator of the value of the goods as warranted. *See Chrysler Corp. v. Schuenemann*, 618 S.W.2d 799, 805 (Tex. Civ. App.–Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("In the absence of other proof of market value as warranted, the price agreed upon between the parties may be taken as the market value of that for which the parties contracted."). This is especially true in this case, given the testimony that the AVC units were unique items manufactured specifically for SMI's needs. The only issue is whether there is sufficient evidence to support the jury's conclusion that the value of the goods at the time and place of acceptance was zero.

accepted and as warranted.]   If the article has no value at all, then the amount paid may be recovered." *Chrysler Corp. v. Schuenemann*, 618 S.W.2d 799, 805 (Tex. Civ. App.–Houston [1st Dist.] 1981, writ ref'd n.r.e.).   Thus, the purchase price of the defective goods is not the proper measure of damages unless the goods have no value at all.  *Id.*  The burden of producing sufficient evidence to support findings of the elements of the proper measure of damages rests on the plaintiff. *Id.*

Defendant asserts that SMI failed to meet its burden of proving the value of the AVC units it accepted because it offered no direct evidence, expert or otherwise, of that value, and impermissibly relied on lawyer argument during closing.  It is true that SMI did not put on direct testimony of the *value* of the AVC units as accepted.  However, SMI's expert, Dr. William Grady, testified that the failures were so frequent that the equipment was "almost useless" and was, in essence, a "liability."   Vol. IV, Tr. 207-08 (docket no. 146-9).  S&C contends that "almost" useless means it had more than zero value.  The Court concludes, however, that a reasonable jury could infer from this testimony that the AVC system was worthless.

But even if this testimony is not direct evidence of zero value, direct testimony concerning value is not the only permissible evidence of value.  *See Chrysler Corp.*, 618 S.W.2d at 805 (finding sufficient evidence to support damages award under § 2.714(b) even though "[t]he record contain[ed] no direct testimony of the market value of the recreational vehicle in its defective condition at the time of sale").  The jury could still determine the value of the units as accepted from other evidence in the record.

SMI also relies on the following evidence to support the jury's determination of the value of the AVC units as accepted: (1) the AVC equipment overheated from day one and continuously overheated; (2) the AVC equipment did not provide the full range of expected correction of voltage

fluctuations; (3) the AVC equipment failed to provide the promised 12 MVAR's of power correction; (4) the AVC equipment experienced repeated capacitor failures, blown fuses, and other malfunctions. SMI introduced evidence at trial that the AVC system did not work, generated no profit, cost SMI in incidental costs (downtime and maintenance) in connection with the significant failures it experienced, and was rendered useless by fire caused by its own defect. The Court agrees with SMI that there was sufficient evidence from which the jury could conclude that the AVC units had no value as accepted.

Nevertheless, S&C argues that the value of the AVC units cannot be zero because SMI used them for ten months and received some benefit from that use. Defendant notes that Henry Camarillo admitted that the AVC units both corrected voltage sag and improved power factor to acceptable levels during the ten months that SMI operated them, until they were destroyed by the fire. Defendant also notes that, two days before the fire, the AVC system was "performing at or exceeding its design capabilities."

However, courts and commentators recognize that "the value of the goods received may be zero . . . even if the buyer used the goods to some extent." White, Summers, & Hillman, Uniform Commercial Code § 11:3 (6th ed.)(citing cases). In *Massey–Ferguson Credit Corp. v. Webber*, 841 F.2d 1245 (4th Cir. 1988), the Fourth Circuit rejected a challenge to a jury's determination that a defective combine was essentially worthless. It was undisputed "that the combine did not at any time perform to [the buyer's] satisfaction," the machine lost approximately twenty percent of the crops it harvested rather than the normal two-to-three percent, and repeated remedial efforts by the dealer's service personnel were unavailing. *Id.* at 1247. Despite the problems, the buyer did use the combine "in some fashion in three harvests on her farm." *Id.* The Fourth Circuit reversed the district court's order for a new trial, in which the trial court had concluded that the buyer had failed to present

evidence of value at the time of acceptance.  The court pointed to testimony that a combine that would not perform properly was "worth nothing" and that the defective machine had only salvage value, finding this to be a substantial basis for a reasonable jury to assess damages.  *Id.*  The court noted that the goods in question were specialized equipment, and found that "[a] machine manufactured and purchased solely for use in commercial farming has little more than scrap value if it cannot be operated economically."  *Id.* at 1250.  It concluded, "We have no doubt that a combine that wastes twenty percent of the harvested crop falls within that category."  *Id.*

Similarly, the El Paso Court of Appeals has held that a grinder had no value to a company engaged in grinding sulfur for a commercial market when the grinder as warranted would produce 3,200 pounds of ground sulfur per hour, but as delivered produced only 800 pounds per hour.  *Sweco, Inc. v. Continental Sulfur & Chemical*, 808 S.W.2d 112, 118 (Tex. App.–El Paso 1991, writ denied). Because of the problems with the first grinder, the mill purchased a second grinder, which also ground only 1,800 pounds per hour, and eventually production ceased.  *Id.* at 117.  The grinders also did not produce the quality of product required for sale, although the company did sell some ground sulfur while using the mills.  The jury found the "disparity between the purchase price of the [first] grinder and its value to [the buyer]" to be the purchase price.  *Id.* at 117.  The court of appeals held that the evidence "was sufficient to establish that the [first] mill as warranted, with an estimate production of 3,200 pounds of ground sulfur per hour, had no value at the actual production rate." *Id.* at 118.  It reasoned that the "jury was at liberty, based upon the evidence, to find the value to [the buyer]."  It summarized the evidence as "[t]he mill was shut down.  A larger mill was purchased.  It was shut down.  Grinding of sulfur for resale was discontinued."  *Id.*  Although it acknowledged that the grinder "probably had some market value, . . . the jury could find it had no value to a company engaged in grinding sulfur for a commercial market."  *Id.*

The same court upheld a jury finding that specially designed software that only malfunctioned three times a week, or was about 93 percent accurate, still had no market value because the occurrence of malfunctions was unpredictable, the manifestations of malfunction were not always contemporaneously revealed, and the length of time devoted to correction was dependent upon the timing of the malfunction and its discovery. *Integrated Title Data Sys. v. Dulaney*, 800 S.W.2d 336, 340 (Tex. App.–El Paso 1990, no writ). The defendant had sought to refute the zero valuation "by attempting to suggest that some worth was reflected in the percentage of computer time not afflicted by manifestation of the programming flaws and by indicating the numerical instances of malfunction per day or per week." *Id.* The court also acknowledged that personal worth is not necessarily the same as market value, but noted that with a "vertical market item" involving custom goods, "there is logically a greater congruity or correlation between the personal value to the customer and the product's 'market value.'" *Id.* Though Defendant attempts to distinguish this case on the basis that the program could not be debugged and thus there existed no possible remedy, it nevertheless supports SMI's position that making some use of a defective product does not mean that it cannot be found to be worthless. In addition, S&C did not prove at trial that all problems with the AVC units had been fixed or that the system would no longer malfunction; it showed only that it was working for a time before it was destroyed by the fire.

And the Northern District of Texas district court held that there was sufficient evidence of zero value where an ice storage system could not adequately cool the building, even though various components of the system might have had salvage value, because the system as a whole (which continued to be used as a replacement for the existing system) provided no benefit to the purchaser. *Carrier Corp. v. Performance Properties Corp.*, Civ. A. No. 3:930CV-0814, 1997 WL 527313 (N.D. Tex. Aug. 19, 1997). Defendant attempts to distinguish this case on the basis that the ice storage

system was never capable of adequately cooling the building, while the AVC units did perform shortly before the December 2006 fire.  However, the jury was entitled to find from SMI's evidence that the AVC units were worthless even if the AVC units did perform in some manner before the fire. Further, evidence that the system was working for a time is not evidence that all the defects were repaired or repairable, nor is it evidence that the system would not continue to malfunction, even if it had not been destroyed by the fire.

In addition, the cases relied on by S&C are distinguishable.  S&C cites *Henderson v. Ford Motor Company*, 547 S.W.2d 663 (Tex. App.–Amarillo 1977, no writ), in which a car buyer complained of defects with her car.  The evidence concerning problems with the car included that there was improper fitting or insulation around the windshield and vent glasses, some holes and flaws in the fire wall, improper fitting of the door on the driver's side and imperfections in the exterior paint, as well as unspecified "structural defects." *Id.* at 667.  The evidence showed that the warranty was a limited warranty to repair or replace defective parts, and that every defect was repaired by the dealership under the warranty. *Id.* at 667.  After the buyer brought the car in for repairs a third time, she did not go back to see whether the repairs had been made, and instead purchased another car. *Id.* In affirming the buyer's take-nothing judgment on her breach-of-warranty claims, the court held that no evidence was presented as to the value of the automobile having the defects claimed, even if the defects were never remedied. *Id.* at 669.

In *Simmons v. Simpson*, 626 S.W.2d 315 (Tex. App.–El Paso 1980, no writ), another car case, the court of appeals found there was no evidence to support the jury's finding that the automobile in question, which had sold for $1,900, had a value of $1,825 at the time of purchase.  There was no evidence of value other than an expert's opinion that the car in good condition was worth $1,775. Thus, while these cases stand for the undisputed proposition that defects alone do not establish that

a product has no value, SMI's case does not rely solely upon the defects to establish that the AVC

units had no value.  In contrast, as noted, there was sufficient evidence in this case from which the

jury could conclude that the value of the AVC units at the time of acceptance was zero.

**B. Collateral Source Rule**

Under the "collateral source rule," a party may not have the benefit of insurance

independently procured by the injured party, and to which the party was not privy.  *Brown v.*

*American Transfer & Storage Co.*, 601 S.W.2d 931, 934 (Tex. 1980) (citing *Texas & Pac. Ry. Co.*

*v. Levi & Bro.*, 59 Tex 674 (Tex.1884)).  The collateral source rule is an exception to the one

satisfaction rule.  *Id.*  S&C contends that the collateral source rule does not apply to contract and

warranty claims, and thus SMI's recovery should be reduced by the $275,650 insurance payment it

received from its insurer after the fire.

S&C argues that the collateral source rule is a tort concept, *see* RESTATEMENT (SECOND) OF

TORTS § 920A, and has no application in the contract and warranty context because otherwise the

plaintiff would benefit more from the contract's breach than its performance. *See* RESTATEMENT

(SECOND) OF CONTRACTS § 347 cmt. e. ("The principle that a party's liability is not reduced by

payments or other benefits received by the injured party from collateral sources is less compelling

in the case of a breach of contract than in the case of a tort.").  Although Texas unquestionably

applies the collateral source rule in tort actions, there is no definitive case law concerning its

application in contract and warranty actions.[2]  This problem is not limited to Texas.  *See* John G.

---

[2] SMI cites two court of appeals cases.  In *Beijani v. TRC Serv., Inc.*, Civ. A. No. 14-08-00750, 2009 WL 3856924, at *5-6 (Tex. App.–Houston [14th Dist.] Nov. 19, 2009, no pet.), the plaintiff's car was damaged by a flood, and plaintiff took the car to defendant's repair shop. Plaintiff's insurance issued a check payable to plaintiff and defendant, but plaintiff refused to sign the check because defendant performed the repairs without authorization.  The jury found that defendant had violated the DTPA, breached a warranty, acted negligently, and converted the car. The Houston court of appeals applied the collateral source rule (assuming without deciding that the

Fleming, *The Collateral Source Rule and Contract Damages*, 7 CAL. L. REV. 56 (1983) (noting that "the problem of the effect of collateral source payments on contract damages has evoked few responses that might give direction to a principled approach"). Fleming argues that there is no "principled distinction in the application of the collateral source rule between contract and tort" and notes that, where the collateral source is the plaintiff's insurer with subrogation rights, courts may avoid the choice between granting a windfall to the plaintiff or to the defendant.

The Court finds that the collateral source rule should apply on the facts of this case. It is undisputed that SMI received insurance payments from insurance it independently procured for its own benefit, and thus the payments qualify as a "collateral source." Further, as pointed out by SMI, its insurance company may have subrogation rights, in which case SMI would not receive a double recovery for the AVC units, and S&C would properly bear the burden of its breach rather than the insurer. In addition, although this is a breach of contract case, SMI did not insure the performance of the contract or the AVC units, but rather received insurance payments for property damage due to the fire that included, in part, the damage to the AVC units. SMI argued that defects in the AVC system it purchased from S&C caused that fire. *See* Fleming, 56 Cal. L. Rev. at 66 (noting that contract claims involving property damage are more akin to tort actions); *see also* RESTATEMENT

---

plaintiff received the insurance money since there was no evidence the check was ever cashed). In *Century Paper, Inc. v. Perrino*, 551 S.W.2d 507, 511 (Tex. App.–Texarkana 1977, writ ref'd n.r.e.), the court of appeals applied the collateral source rule to unemployment compensation benefits in a suit for breach of an employment contract.

S&C cites *Global Petrotech, Inc. v. Engelhard Corp.*, 824 F. Supp. 103, 104 (S.D. Tex. 1993), in which the federal district court declined to apply the collateral source rule to a breach-of-contract claim because, under general contract law, a party should not benefit more from a contract's performance than from its breach. S&C also cites *Booth v. Texas Builders' Supply Co.*, 47 S.W.2d 427, 429 (Tex. Civ. App.–Beaumont 1932, no writ), which did not involve application of the collateral source rule but merely stands for the proposition that a party is not to be put in a better position by the recovery of damages for breach of contract than he would have been if there had been performance.

(SECOND) OF TORTS § 401A (strict products liability).[3]

Last, as pointed out by SMI, S&C has not shown that, if the insurance payments are not credited, SMI would be in a better position than it would have been had S&C not breached the warranties.  SMI paid a $200,000 deductible, in addition to premiums for the insurance.  And SMI produced evidence of other costs and expenses incurred by SMI in relation to obtaining and maintaining the AVC system.  SMI did not seek these damages from the jury, but they are relevant to the Court's determination that S&C has not shown that SMI would benefit more from the contract's breach than its performance.

Even if the collateral source rule does not apply, S&C has failed to demonstrate that the $275,650 remittitur it requests is appropriate.  S&C contends that SMI received the $275,650 in insurance payments "for the loss of the units" and thus its warranty recovery on those units must be offset by that amount.  However, S&C fails to show that SMI received $275,650 in insurance payments "for the loss of the AVC units." Rather, the evidence relied upon by S&C shows that it did not receive that amount.

It is undisputed that the fire destroyed one AVC unit, as well as adjacent property, and rendered the other unit inoperable.  The total amount of the insurance claim paid was $475,650, and SMI bore $200,000 of that loss through its deductible.

S&C relies on a "Value of Loss" analysis prepared for SMI's insurer.  S&C contends that

---

[3]This fact distinguishes *Global Petrotech, inc. v. Engelhard Corp.*, 824 F. Supp. 103 (S.D. Tex. 1993), in which the district court refused to apply the collateral source rule to a breach-of-contract claim.  In that case, the seller had breached the contract by sending incorrect goods.  The buyer returned the goods by shipment, and insured the shipment for the purchase price.  When the goods vanished, the buyer received the insurance payment, but then later sued the seller for breach of contract. The district court cited the principle that a party should not benefit more from a contract's breach than from its performance in holding that the insurance proceeds would reduce a damage award for breach of contract.

these "insurance documents demonstrate that the majority of the insurance settlement was specifically intended to compensate SMI for the loss of the AVC units." Docket no. 148 at 8 (citing Ex. I). However, the Value of Loss document states that the total value of the loss calculated by the adjuster was $409,150, of which only $239,700 appears to be allocated to replacing and repairing the AVC units ($152,700[4] for replacing the "west" unit, and $87,000 for cleaning and repairing the "east" unit). Based on this document, SMI received $239,700 related to loss and damage to the AVC units, not $275,650. And given that SMI paid a $200,000 deductible, it would have received only $39,700.

S&C further argues that, because there was a dispute over the total amount of the loss that included a dispute about whether the primary unit could be repaired or had to be replaced, the insurer agreed to increase the payment by $66,500[5] (to a total of $475,650), which S&C thus claims is also payment for the AVC units. Even if this is true, S&C's evidence demonstrates that SMI received $306,200 in payments related to the AVC units, but again fails to take into account that SMI paid a $200,000 deductible. As such, an appropriate remittitur would be at most $106,200, not the $275,650 remittitur sought by S&C. Thus, S&C's claim that SMI's recovery should be reduced by $275,650 must be rejected.

## C. Prejudgment Interest

Where jurisdiction is based upon diversity of citizenship, state law governs the rate of prejudgment interest. *Boston Colony Ins. Co. v. Tiner Assocs., Inc.*, 288 F.3d 222, 234 (5th Cir. 2002). Under Texas law, the prejudgment interest rate is equal to the post-judgment interest rate

---

[4] S&C states that the payment was $216,600 for the west unit. However, the itemized list shows that this amount was discounted $62,000 to reflect the discount given by S&C, as well as a $500 training adjustment discount, and a $1,400 scrap value discount, for a total of $152,700.

[5] S&C incorrectly states that this was an increase of $69,500.

applicable at the time of judgment. TEX. FIN. CODE § 304.103.[6] The rate of post-judgment interest

is determined by the Consumer Credit Commissioner in accordance with Texas Finance Code §

304.003(c). The current rate is 5%. It is computed as simple interest and does not compound.

SMI contends that it is entitled to an award of prejudgment interest on its $306,500 verdict

at a rate of 5%, beginning on November 12, 2009, the date suit was filed.[7] S&C contends that, even

if the Court does not reduce the amount of damages by the amount of the insurance payment, it must

still take the $275,650 insurance payment into account when calculating prejudgment interest. S&C

argues that the purpose of prejudgment interest is to compensate a claimant for the lost use of money

due as damages during the lapse of time between the accrual of the claim and the date of the

judgment, and that SMI will be overcompensated if it receives prejudgment interest on the damages

award when it previously received insurance payments for the same harm. In addition to relying on

the purpose of prejudgment interest awards as compensation for lost use of money, S&C cites the

"declining principal" approach endorsed by the Texas Supreme Court in *Brainard v. Trinity

Universal Ins. Co.*, 216 S.W.3d 809, 816 (Tex. 2006).

The Court appreciates S&C's argument that Plaintiff should not receive prejudgment interest

for damages based on the AVC units when it has received insurance payments for the AVC units.

However, the Court has already concluded that the collateral source rule will apply and that, even if

the collateral source rule does not apply, S&C's contention that SMI's damages must be offset by

---

[6] This is determined by the Texas post-judgment interest rate. However, awards of post-judgment interest in diversity cases in federal court are governed by the federal post-judgment interest rate. 28 U.S.C. § 1961; *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421 (5th Cir. 2003) ("In a diversity case, the federal post-judgment interest statute applies.").

[7] Under Texas law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date the defendant receives a written notice of a claim, or (2) the date suit is filed, and ends on the day preceding the date judgment is rendered. TEX. FIN. CODE § 304.104.

$275,650 is factually unsupported, and those conclusions apply here as well.[8]  SMI argues that, although Texas courts have applied the collateral source rule for over a century, S&C does not cite any cases holding that insurance payments (or other collateral source payments) must be taken into account when calculating prejudgment interest.  *Brainard* stands for the proposition that *settlements* should be credited when paid to reduce prejudgment interest.  But settlement payments are not collateral source payments.  Accordingly, the Court concludes that prejudgment interest will be calculated on the full verdict amount of $306,500, beginning November 12, 2009.

## Conclusion

Plaintiff's Motion for Entry of Final Judgment (docket no. 141) is GRANTED and the Court will issue judgment for $306,500, plus prejudgment interest at the rate of 5%, beginning November 12, 2009.  Defendant's Motion for Judgment as a Matter of Law and, in the alternative, Rule 59(e) Motion for Remittitur of Damages (docket no. 142) is DENIED.  Plaintiff is awarded its costs of court and shall file a bill of costs and any motion for attorney's fees pursuant to the Local Rules.  The Court will issue a separate judgment pursuant to Rule 58.

SIGNED this 7th day of March, 2013.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[8] As with the remittitur, S&C erroneously argues that the damages on which prejudgment interest is calculated should be reduced by the full $275,650 insurance payment, even though the evidence it cites shows that SMI received insurance payments for the AVC units (after the deductible) of between $39,700 and $106,200.